JM:SCJ
F. #2011R00135

M11-1117

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

- against -

DANIEL GALLAGHER,

Defendant.

- - - - - - - - - - - - - - - - - -X

**TO BE FILED UNDER SEAL**

COMPLAINT AND AFFIDAVIT IN
SUPPORT OF ARREST WARRANT

(18 U.S.C. § 1343)

EASTERN DISTRICT OF NEW YORK, SS:

PAUL F. ROBERTS, JR., being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), duly appointed according to law and acting as such.

Upon information and belief, there is probable cause to believe that in or about and between October 2009 and September 2011, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant DANIEL GALLAGHER, having devised a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, did knowingly and intentionally cause to be transmitted by means of wires in interstate commerce writings, signs, signals and pictures for the

purpose of executing such scheme and artifice.

(Title 18, United States Code, Section 1343).

The source of your deponent's information and the grounds for his belief are as follows:

I. Background

1. I have been a Special Agent with the FBI for approximately three years. The facts set forth in this affidavit are based on interviews of investors and other individuals, information obtained from the review of documents, and information obtained from others in law enforcement who participated in the investigation. In the portions of this affidavit that describe the contents of documents or statements of witnesses, they are reported in substance and in part, unless otherwise indicated.

2. Because I submit this affidavit for the limited purpose of establishing probable cause to arrest the defendant, I have not set forth all facts known to me about this investigation and case.

II. The Defendant and Nano Acquisition Group, LLC

3. In or about September 2009, the defendant DANIEL GALLAGHER began soliciting investments in Nano Acquisition Group, LLC ("NAG"), a Delaware limited liability company formed in September 2009 with its principal place of business in Port Washington, New York. NAG was formed for the purpose of

acquiring certain assets of Nanodynamics, Inc., a company that filed for Chapter 7 bankruptcy in or about July 2009. Nanodynamics owned several patented technologies, including a solid oxide fuel cell technology.

4. In NAG's offering materials, which GALLAGHER participated in drafting, potential investors were told that NAG sought to raise approximately $7.5 million and that "[n]o fees or salaries shall be paid to the Managing Member or any employee of [NAG] until at least $1 million is raised." In addition, the offering materials also stated that "[i]f the acquisition [of Nanodynamics stock or assets] is unsuccessful [NAG] will return the Members' investments, minus expenses not to exceed 3% of the funds raised not including any sales commission charges."

5. NAG's offering materials, which were distributed in or about September 2009, identified Vision Securities, Inc. as NAG's investment advisor and placement agent for the offering and disclosed that investors who purchased their membership interest in NAG through Vision Securities would be charged a 7% sales commission. Vision Securities was a registered broker-dealer with its principal place of business in Port Washington, New York. GALLAGHER was a registered representative of Vision Securities and one of the two controlling shareholders of GCG Holdings, Inc., the owner of Vision Securities. In or about August 2009, the Securities and Exchange Commission ("SEC")

obtained a civil judgment against Vision Securities and GALLAGHER in SEC v. Christopher Castaldo et al., No. 08-Civ-8397 (JSR)(S.D.N.Y.) and they were ordered to jointly pay a $179,718 judgment. Shortly after this judgment was entered, the Financial Industry Regulatory Authority ("FINRA"), an independent regulator of securities firms, ordered Vision Securities to cease all securities business because Vision Securities was net capital deficient.[1] Because Vision Securities was not permitted to sell securities, it could not receive any compensation for selling NAG membership interests. Instead, on or about October 1, 2009, GALLAGHER caused NAG to formally hire him.

6. While GALLAGHER was not identified in the NAG offering materials as an employee or executive of NAG, GALLAGHER controlled NAG. GALLAGHER selected and worked with the attorneys who prepared the offering materials, selected NAG's "Managing Member," solicited investors, represented NAG with respect to its efforts to acquire Nanodynamics' assets and withdrew funds from NAG's bank accounts.

7. From October 2009 through September 2011, GALLAGHER raised approximately $485,000 from thirteen investors who invested in NAG. Many of these investors had previously invested in Nanodynamics through GALLAGHER and Vision Securities

---

[1] Vision Securities' membership with FINRA was cancelled on January 8, 2010.

before Nanodynamics had filed for bankruptcy. In January 2010, most of Nanodynamics' assets were sold to a third party. GALLAGHER continued to raise funds for NAG, acquiring approximately $183,000 in additional investments after that date.

8. On or about May 27, 2010, GALLAGHER emailed NAG's investors to inform them that "the greatest potential for a return on investment is to develop the next generation fuel cell." In other words, NAG had failed in its stated goal of purchasing Nanodynamics' technology, but GALLAGHER proposed developing the technology independently instead. GALLAGHER told investors that their "membership interest in [NAG] will be replaced by founder shares in the new company, Watt Fuel Cell Corporation," ("WATT"). GALLAGHER further stated, "To date [NAG] has expended approximately $300k in connection with analyzing all assets of [NanoDynamics], participating in the bankruptcy process, maintenance of [NAG] and the development of the new company."

9. In or about September 2010, 1,000,000 shares of WATT were issued to GALLAGHER's father, who was on WATT's board of directors. No shares of WATT were issued to GALLAGHER or to anyone based on their investment in NAG. GALLAGHER, however, has represented to NAG investors that the WATT shares held by his father will be redistrbuted to the NAG investors. In or about August 2011, GALLAGHER sent a letter to a NAG investor claiming

that his father "is considering distributing shares of [WATT] to all members of [NAG]," but that the NAG investors will be responsible for covering the legal expenses related to such a distribution.

10. Although NAG failed to acquire any of Nanodynamics' stock or assets, none of the investment proceeds were returned to investors or provided to WATT. GALLAGHER appears to continue to solicit investments in NAG, a defunct entity. For example, according to a NAG investor who was interviewed on or about October 7, 2011 (Investor #6), GALLAGHER and Investor #6 continue to speak on a daily basis, and Investor #6 said that he continues to invest in NAG.

11. I have reviewed NAG's bank accounts and other documents, and, of the approximately $485,000 raised from investors for NAG between October 2009 and September 2011, approximately $50,000 or about 10%, of the raised funds were used for purposes described in NAG's offering materials, such as lawyers' fees and expenses associated with the formation of NAG and to participate in the Nanodynamics bankruptcy proceeding.[2] The remainder of the money, approximately $435,000, was withdrawn from NAG's bank accounts by GALLAGHER either in the form of

---

[2] Of this $50,000, approximately $10,000 was spent on rent. To the extent NAG funds were used to pay rent for offices occupied by Vision Securities, this money was not used for purposes described in NAG's offering materials.

checks made out to himself or direct cash withdrawals, in direct violation of GALLAGHER's promises in the offering materials to use the investors' money to purchase assets of Nanodynamics and not to take any fee or salary until $1 million was raised.

III. <u>Investor Interviews and Review of Bank Records</u>

12. During the course of the investigation, the government has interviewed several of the NAG investors who were victims of GALLAGHER's fraud and reviewed NAG's bank account records. All the interviewed investors stated that GALLAGHER was their primary, if not sole, contact for their investment in NAG. For the most part, the investors stated that they understood, based on conversations with GALLAGHER, that their investment in NAG is now an investment in WATT and they are unaware that GALLAGHER misappropriated money invested in NAG.

13. Investor #1, who was interviewed in March 2011 and again in early September 2011, stated that GALLAGHER had approached him about investing in NAG. Investor #1, who had previously invested in Nanodynamics through GALLAGHER, understood from GALLAGHER that NAG planned to buy the rights to fuel cell technology from Nanodynamics. NAG's bank records show that Investor #1 invested $10,000 in NAG in or about November 2009, invested an additional $5,000 in or about April 2011,³ and $5,000

---

³ When interviewed in September 2011, Investor #1 did not recall making this second investment in NAG, but a review of bank

in September 2011. Based on conversations with GALLAGHER, Investor #1 told an FBI Special Agent in March 2011 that he believed that NAG is merging with WATT and that GALLAGHER's father is holding the NAG investors' shares in WATT until September 2011, at which time Investor #1 will receive shares of WATT. Investor #1 later provided the FBI with a copy of the letter he received from GALLAGHER in or about August 2011 which was addressed to all members of NAG. In that letter, GALLAGHER asked the NAG investors to sign "to acknowledge your understanding and agreement to the facts that evolved as [NAG] sifted its way through the bankruptcy of Nanodynamics and ND Energy." GALLAGHER also stated that "it was understood that Mr. Gallagher, the managing member, would take a salary and cover expenses incurred." GALLAGHER also stated in this letter that his father "is considering distributing shares of [WATT] to all members of [NAG]. There will be legal expenses which shall be covered by member of [NAG], I will know more detail as to legal expenses and will contact all members next week."

14. Investor #2 stated that GALLAGHER solicited his investment in NAG. Investor #2 had previously invested in Nanodynamics through GALLAGHER. Based on conversations with GALLAGHER, Investor #2 understood that NAG was formed to bid on

---

records reflect a wire transfer of $5,000 from Investor #1 into NAG's bank account in April 2011.

and purchase the assets of Nanodynamics. Investor #2 invested $40,000 in NAG in or about October 2009 and invested an additional $60,000 in or about July 2010. According to Investor #2, GALLAGHER told him that his investment in NAG would be transferred to shares in WATT, and that shares in WATT owned by GALLAGHER's father are actually owned by NAG investors.

15. Investor #3 stated that he spoke to GALLAGHER about investing in NAG after Nanodynamics went bankrupt. Based on conversations with GALLAGHER, Investor #3 understood the purpose of NAG was to determine if there were any assets of Nanodynamics worth purchasing and then to purchase the identified assets. GALLAGHER also told Investor #3 that only a modest percentage of the invested money would be used for administrative fees and salaries. Investor #3 believed that if NAG was unsuccessful, he would not lose a substantial portion of the investment to these fees, and that either most of the invested money would be returned to Investor #3 or other options could be explored. NAG's bank records reflect that Investor #3 wired $100,000 into NAG's bank account on October 26, 2009. Investor #3 stated that it was his understanding, based on conversations with GALLAGHER, that his $100,000 investment in NAG would be converted to 250,000 shares of WATT. GALLAGHER has continued to solicit additional investments in WATT from Investor #3, including in or about December 2010, but Investor #3 has declined

to invest any more money.

16. Investor #4 stated that GALLAGHER approached him in April 2010 about investing in WATT. After several discussions, Investor #4 agreed to purchase 100,000 shares of WATT at .40 per share in or about June 2010. When Investor #4 wrote two checks totaling $40,000 for the WATT shares, GALLAGHER told Investor #4 to write the checks to NAG, which GALLAGHER said had purchased WATT. Prior to this, Investor #4 had never heard of NAG. Bank records reflect Investor #4's money was deposited into the NAG's bank account in early June 2010. GALLAGHER spent $480 on WATT business expenses, and withdrew almost all of the remaining money in cash by July 2010. Shortly after investing, Investor #4 asked GALLAGHER where his money had gone, and GALLAGHER stated that he had spent it all on accountant and other fees. Investor #4 then invested separately in WATT, and Investor #4, along with others who became involved in WATT, asked GALLAGHER to not associate himself with WATT but agreed to place GALLAGHER's father on WATT's board of directors.

17. Investor #5 stated that GALLAGHER approached him in early 2011 to invest in WATT. GALLAGHER said he was selling shares of WATT at .40 per share. GALLAGHER told Investor #5 that he started WATT with a partner, the company hired a scientist, and WATT planned to develop a fuel cell. Investor #5 said he invested $15,000 in WATT, and GALLAGHER promised he would send

the WATT stock certificates soon. Bank records reflect that Investor #5 sent a wire transfer of $15,000 from Dayton, Maryland to NAG's bank account in Port Washington, New York on or about May 4, 2011.

III. <u>Interview of Watt Fuel Cell Representatives</u>

18. The FBI also interviewed the president of WATT, WATT's corporate counsel, and two members of WATT's board of directors, including GALLAGHER's father and NAG Investor #4 (discussed above). According to WATT's representatives, GALLAGHER did participate in the initial discussions and meetings relating to the formation of the new company WATT, but GALLAGHER did not invest any money in WATT on behalf of himself or anyone else, and neither GALLAGHER nor NAG owns any shares of WATT. After GALLAGHER failed to invest any money in WATT, certain members of WATT decided that they did not want GALLAGHER associated with WATT. In September 2010, GALLAGHER entered into a written agreement with WATT to not hold himself out as an authorized agent or representative of the company. In addition, GALLAGHER agreed to not solicit or contact any individuals for the purpose of soliciting investments in WATT. GALLAGHER's father, as well as the other WATT representatives, confirmed that he is on WATT's board of directors and he was given one million restricted shares of WATT in September 2010 for his position on the board. Since May 2011, WATT has been raising capital through

a private placement handled by a registered broker dealer. According to WATT's counsel, GALLAGHER has had no role in raising capital for WATT. According to GALLAGHER's father, who was interviewed in August 2011, he said he understood that GALLAGHER had implied to NAG investors that their investment in NAG would be connected to WATT and that he felt he had a moral obligation to fulfill his son's promise but he did not know when or how this would happen.

WHEREFORE, your deponent respectfully requests that a warrant be issued for the arrest of the defendant DANIEL GALLAGHER so that he may be dealt with according to law. Your deponent also requests that this affidavit and the arrest warrant for the defendant be sealed, except that the FBI may disclose this affidavit and the arrest warrant as necessary to effectuate the arrest and arraignment of the defendant.

_____
PAUL F. ROBERTS, JR.
Special Agent
Federal Bureau of Investigation

Sworn to before me this
10th day of November, 2011

Y
E